And we will hear Thompson v. Small. May it please the court. Good morning, your honors. Mick McFarland. I represent appellants Ben Small, Keith Clark, Tom Dingus, Deborah Long, Cynthia McMullen, and Misty Renau. If I may reserve five minutes for rebuttal, there are two types of speech that we are looking at in this case. One includes Mr. Thompson's Facebook posts. And the second type of speech is the speech that occurred at school during the course and scope of Mr. Thompson's employment. And I'm going to talk about each of those types of speech separately and because the analysis is different with respect to the Facebook posts versus the at school speech. But in the end, whether we analyze the case under the Facebook posts or we analyze the case under the at school speech or a combination of both, qualified immunity should have been granted for my clients. Before I talk, however, specifically about those two different types of speech, I want to point out two things that I believe are relatively important in this case. First is that the trial court or district court's decision in this case on its face dealt solely and only with the Facebook posts for reasons that are not clear in the opinion from the district court. The district court just did not touch on the second category of speech that we're dealing with. And that matters because that speech, the at school speech, did not involve matters of public concern and give rise to a finding of qualified immunity for my clients. The second point I want to make is I think this case is very unique from First Amendment cases that at least I've been involved with or that I've read in that when we deal with First Amendment retaliation cases, we as lawyers and you as judges come in after the fact and the lawyers argue the Pickering balancing test and how it applies to the facts of this case. And then, of course, you as the judges apply the facts to the Pickering balancing test and make a decision of whether or not the test favors the defendant or the plaintiff. In this case, I think it's very unique and it's relevant to the issue of qualified immunity that the school district actually went through and overtly and actually undertook a Pickering balancing test before any decisions were made with respect to Mr. Thompson's employment. And they did that or went through that Pickering balancing test by hiring an outside attorney, Anne Allen, to perform an investigation into the underlying allegations. And then with that information, took it to the next step and had the impact interviews that were performed by Assistant Superintendent Jay Rowell, in which he actually looked at or interviewed people to determine whether the speech at issue caused the type of disruption within the school system that we look at when we're doing a Pickering balancing test. So at the end of the day, whether we're looking at the Facebook post speech or we're looking at the at school speech under either scenario, my clients actually underwent the Pickering balancing test. We know that. And so the question at the end of the day is, even if we disagree with the ultimate outcome of the transfer of Mr. Thompson to a teaching position, the question is, was it patently unreasonable for my clients to believe they had the constitutional right to make that decision, knowing that my clients actually went through the actual Pickering test that this court requires? Well, what you're really suggesting is that there's some kind of safe harbor if there was an outside investigation and counsel came to the conclusion that the school board was justified. Isn't that basically what you're arguing? Well, I don't know if I would go so far, Your Honor, as to say it's a safe harbor. I would say that in the qualified immunity context for the individual defendants, it gives this court great insight, especially in light of well-established law, that there will, I believe the language is, rarely be an occasion where a public official has to Would you focus on the non-Facebook language and the board's justification in that instance? Sure. And I will start that, Your Honor, by saying that I don't believe the at-school words and speech are protected under the First Amendment because they don't involve a matter of public concern. When a school administrator refers to short bus students, uses the term short bus, that is a patently derogatory statement that is harmful to the special needs students that the school serves. Along the same lines, and it's kind of, I guess, an extension of that, referring to Governor Inslee as Governor Short Bus, again, has that harmful and detrimental effect to or potentially to students that the district serves. There's also language that he used, such as referring to students as snowflakes or referring to students as Tide Pod Kids or referring to a group of Marshallese students as being, I think it was, farts in a skillet. But all of that, all of those language, whether we agree that they are offensive or not, are simply not protected by the First Amendment when you look at the context and the content of that speech. Would you, you're saying that that would include the reference to the governor? In the context of the speech, yes, if he, I would say, you know, taking it back to the Facebook post now, Your Honor, if you referred to... I'm sticking with the school speech and the governor. So you're saying a school administrator or teacher can't criticize and demean the governor? Certainly an administrator can criticize and demean a governor. The problem is that in the manner or the content of his criticism, he used an epitaph that is derogatory and harmful to special needs students. And that therein lies the difference between, you know, a political statement or a criticism of the government and moves into the field of protecting students. Did I answer your question, Your Honor? Yes, thank you. So are you saying that all of his statements were not matters of public concern? All of his matter, all of his statements at school, yes. Were not, every one of them at school. In the context and content that we are required to look at in determining whether a matter or speech is a matter of public concern, yes. So you're conceding, and you're conceding that his Facebook post was speech, that was a matter of public concern then? The Facebook posts were made as a private citizen and were a matter of public concern. I will agree with that. I will follow up on that, though, Your Honor, and say, you know, a lot of what you read about, and I'm sure that we'll hear about in oral argument, is the undisputed facts, or that there are disputed facts in this case. Let me ask you a question about that. I'm sorry to interrupt, but it was unclear to me and maybe I missed something. Are you, since this was a decision made on summary judgment, are you asking that this court reverse and find there was qualified immunity, or are you saying that there are genuine issues of material fact and that the issue of whether or not qualified immunity applies is premature? Which are you asking? I am asking that this court reverse and find that my clients are entitled to qualified immunity. Based on the record, and that is the undisputed evidence. You believe that your clients are at this point entitled to qualified immunity and not that it should be reversed because it's unclear based upon the record. That is true, Your Honor, and if I may quickly respond to that, I know I'm going into my office, but that is undisputed. There is no dispute that a version of the Facebook post that included the term demtard and included referring to Michelle Obama as a racist bee, those type of things, that's undisputed that he posted those. And the question then becomes, did the officials who analyzed the effects of that, are they entitled to qualified immunity? And I submit that under the Pickering balancing test, they are because of the harmful effect those type of statements can have on the students. Well, I want to just put on the table what bothers me about this case. Leave aside the Facebook post, because while somewhat distasteful in the manner that they were conveyed, they're political statements made in a private capacity. And they aren't disrupting the school, as we generally consider it. But these other statements surfaced only during kind of interviews and focus groups. And none of that had ever come up before in this gentleman's employment history. And so all of a sudden, you know, he's never disciplined or counseled. All of a sudden, because we have the Facebook problem, which is what kicked the whole thing off, we now surface these other allegations. So the question is, how do you disaggregate his demotion between the Facebook and the so-called other statements that may have been made some years before? I think I have three responses to that, Your Honor, maybe only two. OK. The first of which is, we need to separate his claim that he has against Central Valley School District versus the individual defendants. And we have to look at what the individual defendants' roles were in this case. And maybe it proves down the line that the investigation was flawed or that the investigation was biased and that the board ratified a biased or unconstitutional violation. That's a Monell claim against the school district. And that has to be separated from what Ben Small knew and did and what the board did in simply affirming Ben Small's decision. The second point I'll make is that I have not seen a fruit of the poisonous tree type argument applied to a First Amendment speech. And I would submit that just because the administration didn't know Mr. Thompson was engaged in this type of speech at school doesn't make the speech protected. It just means that the administration wasn't aware of it until they performed this investigation. And I would also... That isn't really answering this problem of... The whole thing is because of the Facebook posts. And then we come up with this collateral statements. And let's say I agree with you that those aren't protected as private, political, or other speech because they're made in the school context. But if the firing is predicated in part on the Facebook situation, then aren't there qualified immunity at this stage? I don't believe so, Your Honor, because it was not an adverse employment action to put Mr. Thompson on administrative leave and investigate. And so I would reframe your question as, was it unconstitutional for Ben Small to investigate the Facebook post? Answer is no, it's not unconstitutional. But then it's not an investigation. It's ultimately a demotion. A demotion that, number one, I believe, even if it was based solely on Facebook posts, would be proper because they went through the Pickering balancing test. And when I say proper, I mean entitled to qualified immunity. But secondly, and I'll just reiterate and be done, but just because a constitutional and proper investigation turns up harmful conduct to students doesn't mean you can't take action based upon that harmful conduct to make sure it doesn't happen in the future. Okay, so I'm looking at the requirements under Pickering, and you have said that the school did, in fact, very carefully comply with the requirements of Pickering versus Board of Education. So I'm looking now, and I think what you're saying is under the fourth criteria, whether the school district had adequate justifications that outweighed Thompson's free speech interest, is that, and then, and would they have demoted him anyway? Is that what you're relying on? And what is, if so, what is the undisputed facts that would show that? Because that's what we have on appeal. We have to deal with the record. Well, what Mr. Thompson claims or argues are the undisputed facts are whether or not he necessarily engaged in the conduct for which he was accused. And my position, Your Honor, is that what we look at is what was presented to Ben Small and what was presented to the board, and those are undisputed. And what are they? Tell me what they are in particular, because you're asking us to reverse and grant you qualified or your client qualified immunity based upon the undisputed facts. That's what I'm missing. So the undisputed facts with respect to the Facebook post are that he made that post and that it was distributed beyond his private friends and it was brought to the attention of the superintendent by employees of the school who expressed concern about an administrator in the school and the effect that that could have on students of the school. As it relates to the undisputed facts of the in-school speech, first and foremost, I believe it is undisputed Mr. Thompson never denied having referred to students as short bus, or using the term short bus in school. He likewise never denied using the term governor short bus. There's also, that we haven't touched on yet, but it is undisputed that the board genuinely believed that they had an employee that had been dishonest with them. Mr. McFarland, you're out of time, so why don't you wrap up your answer to Judge Silver in the next 10 seconds and we'll put 30 seconds on the clock for your rebuttal. I appreciate it and I just believe that the information presented to the board was undisputedly, it was undisputed that the investigation had unearthed these type of statements and they reasonably relied on what they believed was a proper investigation. Thank you. Good morning, your honors. My name is Megan Clark and I'm here on behalf of Randy Thompson. I had planned an argument, but I feel it'd probably be more appropriate to talk about some of the questions that your honors have brought up during the course of Mr. McFarland's statements and argument. Let me start by asking, let me start by asking a question about the Pickering balancing test that your friend on the other side spent a lot of his argument talking about. And wouldn't you agree that public employers have an interest in prohibiting speech that undermines the employee's ability to perform his or her job and the employer's ability to carry out their mission? Your honor, I don't disagree that there is a provision and there is law that would suggest that public employers do have the ability to restrict the speech of their employees in some capacity. However, the context of the speech that was made with respect to the Facebook post, as Mr. McFarland pointed out, was clearly private, clearly on a matter of public concern. Not much has been agreed upon. The conduct that has come up with respect to this in-school communication or in-school conduct, those facts are clearly disputed by Mr. Thompson. Mr. McFarland just represented that Mr. Thompson never denied he used certain derogatory terms. He absolutely has. He has denied those. Okay, and that is in the record, you're saying, and it is something that the district court relied on as undisputed, or maybe the district court said it was disputed, or the district court said it was undisputed, that he in fact disputed it. There's a difference of opinion here on what the facts are. That's correct. Mr. Thompson did dispute it and his declarations are in our supplemental record at 26 to 37 and 77 to 88. Those are his declarations disputing some of these facts. Unfortunately, the district court's opinion didn't lay out which facts it believed were disputed. It just indicated that with four or three elements of the Pickering test, element one, two, and four, there were issues of disputed material fact. So we don't know which exact issues the court did determine were disputed, but Mr. Thompson has disputed these particular facts on each occasion. Okay. Do you agree with me then that the district court essentially didn't make the decision as a matter of law? It basically said, there are issues of fact, cannot decide this because they're disputed issues of fact. And once they are resolved, you know, these qualified immunity issues are raised on appeal sometimes very early, and according to the Supreme Court, that's the way to do it. So you're not claiming as a matter of law that the decision of the judge cannot be reversed at a later time? Your Honor, I want to make sure I'm clear. The district court said, and I believe his exact words were, qualified immunity is not appropriate at this time or something similar to those lines. Okay. That's what I thought. Okay. Thank you. So did your client have a Loudermill hearing? There were two notice and opportunity hearings that occurred prior to the letter that he received from Superintendent Small that occurred. And at those hearings, Mr. Thompson was permitted to talk and he provided information disputing some of the information that was presented to him. For the second hearing, I believe he received some of the information at the hearing. He said, whoa, slow down, I'm not getting all of this, because the information was given to him at the hearing. And he had really little to no ability to substantively address some of those issues. That goes to some of the questions of fact with respect to what the school board relied upon, what Mr. Small relied upon. Mr. McFarland made a point, and your Honors picked it up by saying, isn't this providing a safe harbor? By doing this Pickering analysis and going through this, isn't it providing somewhat of a safe harbor? And we would submit to the court that it is. The school board, and I want to highlight some of the issues of fact, because that's clearly what's going on here today. With respect to Mr. Small, we don't have a lot of information with respect to his motivations behind placing Mr. Thompson on administrative leave. We don't have information related to his motivations with respect to this investigation. What role he actually played in it. What level of personal offense he took. He indicates in his declaration at several portions, and that's at the record 352-354, the comments that he makes are so vague, that he was wondering if Mr. Thompson was causing a negative situation or using harmful language that he believed was detrimental. But we don't know which language, we don't know what language, and we don't know what level of personal conflict that he had with the politics of that Facebook post, which everyone agrees was the impetus for this entire investigation. With respect to the school board, I would submit to the court that they were unreasonable, or there's at least a question of fact as to their reasonableness with respect to what they relied upon. And I want to point the court to something important that is in the record. The minutes of the board, they're at ER 209-214. In those minutes, the board started their meeting at 6.34 p.m. They went into executive session with Mr. Thompson at 7.40 p.m., which lasted 60 minutes in accordance with their stated purpose, which was to discuss his employment. They were in there for 60 minutes with Mr. Thompson. During that time, Mr. Thompson submits they were dismissive of him, they didn't listen to what he had to say, and they ended the meeting, they came out of executive session at 8.40, they ended the meeting at 8.45, and within that five-minute period, they made their decision. They all unanimously agreed to uphold Mr. Small's letter and Mr. Small's demotion. When they sent Mr. Thompson his letter indicating that they were agreeing with this, and that's at the record at 58, they say, you were in the meeting with us for one hour, and then we took another hour to deliberate. We don't know when they took that hour to deliberate. We have no idea when that occurred. It did not occur during that meeting according to the minutes. These are the questions of disputed fact about what they relied upon, and was it reasonable? I also want to point out to the court that Mr. Thompson found out, and this is at the record at 35, Mr. Thompson found out three weeks before he had his meeting with the school board that they had posted his job online and were looking for candidates. They made their decision. There's information to demonstrate that they'd made their decision prior to hearing what he had to say with respect to Mr. Small's demotion, and there's information that Mr. Thompson's provided that they didn't care what he had to say. They made their decision. So those are the disputed facts with respect to the school board, at least some of them. There's also a reliance by... Had you completed all the discovery in this case, or was, in your view, the motion to establish or to grant qualified immunity, was that premature? It was filed before all these issues of fact could be resolved. Your Honor, I would agree that this was filed very early on in this case. It was filed within, I believe, a week of the status conference that set the trial date. Okay. So at that point, you hadn't completed discovery? Not at all. Okay. Thank you. And no summary judgment deadline had passed at that point, or motions deadline? No, Your Honor. They had just been set within the last couple of days. And so when we turn to what these disputed facts are, and the reason I highlight these to talk to any of these employees, the names on these impact interviews that they heavily rely upon to show potential harm or a reasonable prediction of harm, the names are redacted. We don't know who those people are that they interviewed. They could be anybody in the district. And I would submit to the court that they have to demonstrate actual concrete harm or reasonable prediction of harm at Evergreen Middle School, not in a district of 16,000 people. They have to demonstrate it that it would occur at Evergreen Middle School. So when we go back to this conduct that occurred, there's no indication that any of those people in the impact interviews were from Evergreen Middle School, that their children were students of Mr. Thompson, that they had any idea that this post existed or that this information was out there before they were interviewed. So I want to tell the court this, and I know I have five minutes left, and I want to answer your questions, but I do want to give you this idea that we've been talking about. On a granular level, giving qualified immunity for these five individual defendants, Mr. McFarland and his clients may believe that it's appropriate at this stage. It's early in the litigation. That's when traditionally immunity should be provided. But I would submit to this court something broader than that, and that is this idea that this would give a blueprint to everybody out there in the future to disagree with one word in a political post, use that one word, and take the long arm of the school district and investigate that post, that political speech, and utilize that, and go from one word in a Facebook post that was meant to be private, political speech, use the arm of the school district to investigate, find remote instances of prior conduct that we don't have the context for, I will tell you that, though we don't have the context for those comments, use that, and then say, we will do a Pickering analysis test on these comments, and then we are insulated. You can't do anything about it. Let me ask you this question. So, assume that I agree or that we agree with you that, and we're viewing the facts in light most favorable to your client because of the stage of the proceeding, and that, so we say, only the Facebook post was the basis of the demotion or the determination. We put aside all of the other facts that were derived or bases that were derived through the investigation, but even with just the Facebook post, what is your best case supporting the argument that it was clearly established that Mr. Thompson's First Amendment rights outweighed the school district's interest, when the argument that's being made is that even that speech in the Facebook post, that derogatory speech undermines Mr. Thompson's role as an administrator and the overall mission of the school? Well, first, I would tell the court that it was, as we've established, private speech that was political in nature. It was made during the summer, and so whether there was any harm is remote, potentially. It was made during the summertime. So are you arguing that there has to be actual harm? Is that the standard that you think is required to be able to satisfy one of the exceptions laid out in Pickering in the balancing test? Because I don't read the cases to require actual harm. I don't either, Your Honor. I agree. It requires actual or a concrete harm or a reasonable prediction of harm. That's the case law, but to demonstrate whether there's a reasonable prediction of harm, there's some inherent factual discussion that goes into what is a reasonable prediction of harm. And what the district can rely upon here are remote statements. But to get to your question, which is, do the derogatory terms, can they regulate those and regulate that speech because it's related to a class of students that they have at their schools? I'm asking, what's your best case for arguing that it was clearly established? That's really the part that I'm getting at. I see. And I apologize. I misconstrued that question. What is clearly established is the right to engage in political discourse. And that is in the Rankin case. And I have it right here, Your Honors. It's at page 387. It talks about debate on public issues, whether it's caustic or whether it's, you know, some people may find the language upsetting. And or in this case, maybe one or two individuals found the language upsetting. He has a clearly established right to engage in political discourse, even if it even if it has some offensive tone to it. OK, so let me ask you this, since you cited Rankin, do you think there's a distinction because in Rankin, you had a low level clerical employee, which is quite different than a principal of a school, somebody who is leading a school and has a much larger role with respect to, you know, arguably the treatment of students and sort of the overall mission of the school. So if you have a principal who is using the word demtard and and part of the mission of the school is to serve students who have special needs, don't you think there's a difference between a low level clerical employee, which is what we're talking about in Rankin versus the facts of this case? Yara, I see I'm out of time. I assume you want me to answer. I do. Thank you. I don't disagree that Rankin discusses a lower level employee. I will correct that Mr. Thompson was an assistant principal. He wasn't the principal of the school. But there is there there is a distinction there that he does have some level of authority within the administration of Evergreen School District. But what we don't have here is any indication that his speech disrupted Evergreen School District, that anyone at Evergreen Middle School, excuse me, Evergreen Middle School had any indication that this occurred. We're premature with discovery, and we do not know who was interviewed and what they believed to be offensive about that. But I don't disagree with your honor that there may be a distinction of the role a person holds. OK, you're saying there is no evidence whatsoever at this point. Is that why? And that's the problem. You're having no evidence on that issue. That's correct, your honor. I wouldn't say there's no evidence, but I would say that, of course, we're looking at what the district court did. So it'd have to be evidence that the district court actually relied on. And did the district court say there are issues of fact concerning this? Is that what the district court? OK, yes, with respect to those three elements of the Pickering test. And we would submit there's questions of fact on all five. And that's because you offered the court evidence that evidence for your client would contradict what the school said. So what did you offer? Your honor, we offered declarations from Mr. Thompson to dispute that. Thank you. You already said that. Thank you. OK, thank you. And I appreciate your time. Thank you. Mr. McFarlane, you ran out of time, but we'll give you 30 seconds in rebuttal. Oh, you're muted, Mr. McFarlane. You need to unmute yourself. I apologize. So going to the question that your honor's asked about Mr. Thompson's best case on the qualified immunity analysis, the response was that it is clearly established that persons have the right to engage in political discourse. That is the exact type of analysis that the Supreme Court, that this court has repeatedly said is too broad to deny qualified immunity. The question has to be focused, and it has to look at the facts of this case, and it has to look at whether reasonable administrators in a school district would believe that they had the right to protect students and the mission of the school by taking action when someone uses a term that is derogatory to special needs students like Demtard. OK, let me just ask you, though. There seems to be a difference between you and plaintiff's counsel as to whether or not the facts are undisputed to establish exactly what you said. Basically, the district court said that there are disputed issues of fact on these matters. Was the district court wrong? I mean, did you offer something to the district court and say, these are undisputed facts, judge, we're entitled to qualified immunity? We did. And the judge said otherwise. Why shouldn't we then give deference to the judge's decision? Because I believe this court can review the record de novo. That is correct, and I'm sorry, it is de novo. But what facts, you're disputing plaintiff's counsel and saying that there aren't disputed facts? As it relates to the Facebook post, there aren't disputed facts. As it relates to the at school conduct or speech, I agree that Mr. Thompson disputes many of those statements. My argument or my position is that we have to look at what was provided to to Ben Small first and then provided to the board and ask if that evidence, which I submit doesn't have to be undisputed for them to make a decision, they can weigh the evidence and we can say the evidence that was before them, a reasonable school board would believe that they had the right to take the action based upon this disputed evidence. Thank you, Mr. McFarland. Thank you, counsel. Thank you. This case is now submitted.
judges: McKEOWN, DESAI, Silver